1

2

3

4

5

6

7

8

9                    **IN THE UNITED STATES DISTRICT COURT**

10                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   ANGELA MUSAAD,                              CASE NO. CV F 06-0096 LJO

13              Plaintiff,                       **DECISION ON SOCIAL SECURITY**
                                                 **COMPLAINT**
14        vs.                                    (Docs. 22, 23.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17              Defendant.
                                      /
18

19                              **INTRODUCTION**

20        Plaintiff Angela Musaad ("plaintiff") seeks this Court's review of an administrative law judge's

21   ("ALJ's") decision that plaintiff is neither disabled nor entitled to Supplemental Security Income ("SSI")

22   under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1382c.  Pursuant to 28 U.S.C. § 636(c)

23   and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a June

24   21, 2006 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all

25   proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and

26   defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES

27   plaintiff's requests to reverse the Commissioner's decision, to award plaintiff SSI or to remand for

28   further proceedings.

                                         1

## BACKGROUND

### Plaintiff's Personal Background

Plaintiff is age 46 and has a high school education and certified nurse assistant ("CNA") training. (AR 17, 157, 182, 257, 686.)  Plaintiff's past employment includes work as a CNA and housekeeper. (AR 17, 157, 186, 193.)

### Administrative Proceedings

#### Plaintiff's Original SSI Application

On January 24, 1997, plaintiff protectively filed her SSI application to claim a mental impairment since November 29, 1994. (AR 144, 148.)  With its March 20, 1997 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and noted that the evidence "does not show that your condition is disabling." (AR 123.)  Plaintiff did not seek further review of her claim denial and "lost her right for further administrative review of that determination." (AR 112.)

#### Plaintiff's SSI Applications At Issue In This Action

On June 2, 1998, plaintiff protectively filed another SSI application to claim back and mental impairment and hip pain since 1995. (AR 149, 153.)  With its December 2, 1998 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 127.)  On December 21, 1998, counsel was appointed for plaintiff. (AR 47.)  On December 28, 1998, plaintiff filed her Request for Reconsideration to note that she suffers from depression and left side arthritis and is unable to "do my daily things." (AR 131.)  With its February 11, 1999 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 133.)

On January 27, 2000, plaintiff filed her Request for Hearing by Administrative Law Judge to claim that she is "unable to work." (AR 137.)  After a September 5, 2000 hearing, the ALJ issued his October 27, 2000 decision to decline to reopen plaintiff's January 24, 1997 SSI application in the absence of good cause, fraud or similar fault. (AR 112.)  The ALJ found that although plaintiff is unable to perform her past semiskilled CNA work, plaintiff is able to perform her past relevant housekeeper work and is not disabled. (AR 120.)  Plaintiff submitted to SSA's Appeals Council her November 7, 2000 Request for Review of Hearing Decision/Order to claim that she is unable to work. (AR 139.)

2

On February 27, 2002, plaintiff protectively filed another SSI application to claim left elbow impairment since July 7, 2001. (AR 71, 77.) With its July 16, 2002 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 58.) In July and August, 2002, plaintiff filed Requests for Reconsideration to claim inability to work and that her "illness" had worsened and that she is "under mental health care treatment." (AR 54, 56.) With its November 21, 2002 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that her condition is not severe enough to prevent her to work. (AR 50.) Plaintiff filed her December 2, 2002 Request for Hearing By Administrative Law Judge to claim inability to work. (AR 34.) With its July 1, 2003 order, the Appeals Council vacated the ALJ's October 27, 2000 decision and remanded the case for a de novo ALJ hearing and further consideration of disability given that the September 5, 2000 ALJ hearing tape had been lost. (AR 122.) The Appeals Council further directed the ALJ to "associate" the claim files for plaintiff's June 2, 1998 and February 27, 2002 SSI applications. (AR 122.)

The ALJ conducted June 16, 2004 and November 2, 2004 hearings, and at the conclusion of the later hearing, plaintiff's counsel indicated that 2002 is the alleged disability onset date given that plaintiff worked in 1999 and 2000. (AR 23, 733-734.) The ALJ issued his January 11, 2005 "new decision on all claims" to find that plaintiff is not disabled and is able to perform her past CNA work. (AR 16, 25.) Plaintiff submitted to the Appeals Council her February 18, 2005 Request for Review of Hearing Decision/Order. (AR 11.) On December 22, 2005, the Appeals Council denied plaintiff's request for review to render the ALJ's January 11, 2005 decision subject to this Court's review.

**Medical History And Records Review**

***Kern Medical Center***

During June 1995 to January 1999, plaintiff received conservative treatment at Kern Medical Center to address her complaints of back and joint pain. (AR 399-401, 426, 428, 431,454.) Plaintiff was prescribed medication for her depressive symptoms. (AR 400, 401.) December 20, 2000 nerve conduction studies suggested mild/moderate entrapment mononeuropathy of the left ulnar nerve. (AR 427.) Plaintiff underwent a successful September 6, 2001 left ulnar nerve entrapment neuropathy. (AR 411.)

3

1

*Kern County Department of Mental Health Services Clinic*

2       In early 1997, plaintiff participated in group therapy at the Kern County Department of Mental

3  Health Services Clinic.  (AR 300-310.)  Notes indicate that plaintiff addressed cocaine abuse after

4  having used a "small" amount of cocaine in December 1996.  (AR 317.)  Plaintiff missed several group

5  sessions.  (AR 301, 303, 304, 309.)  March 4, 1997 notes reflect that plaintiff had been remanded into

6  custody.  (AR 302.)

7       In 2002, plaintiff returned for treatment at Kern County Mental Health Services.  On April 8,

8  2002, plaintiff complained of depression and anxiety.  (AR 561.)  April 12, 2002 notes reflect that

9  plaintiff felt depressed and anxious and had been given medication for depression.  (AR 555.)  The notes

10  attribute plaintiff to state that "she loves taking care of people and wishes she could go back to work."

11  (AR 557.)

12       Staff psychiatrist Shailesh Patel, M.D. ("Dr. Patel"), prepared an April 19, 2002

13  psychiatric/medication evaluation and noted plaintiff's insomnia, decreased energy and feelings of

14  anxiousness, depression, hopelessness, worthlessness and nervousness.  (AR 543.)  Dr. Patel's mental

15  status examination revealed plaintiff's appropriate affect, mildly depressed mood, partial insight,

16  adequate judgment, and absence of psychomotor agitation or retardation.  (AR 544.)  Dr. Patel's

17  diagnosis included depressive disorder not otherwise specified, heroin and alcohol dependence,

18  reportedly in remission, personality disorder not otherwise specified, and rule out antisocial personality

19  disorder.  (AR 544.)

20       May 17, 2002 notes reflect plaintiff's good medication compliance without side effects,

21  depressed mood, constricted affect, unremarkable thought process, fair insight and judgment, average

22  intelligence, and intact memory, attention/concentration and orientation.  (AR 540.)  July 2002 notes

23  reflect that plaintiff attended and performed well in adult school.  (AR 531, 532.)  July 19, 2002 notes

24  reflect plaintiff's good medication compliance, depressed mood, marginal sleep, constricted affect,

25  unremarkable thought process and content, fair insight and judgment, average intelligence, and intact

26  memory, attention/concentration and orientation.  (AR 527.)  August 23, 2002 notes reflect plaintiff's

27  good medication compliance, ok sleep, cooperative behavior, depressed mood, appropriate affect,

28  unremarkable thought process and content, fair insight and judgment, average intelligence, and intact

memory, attention/concentration and orientation.  (AR 519.)

Dr. Patel completed an August 30, 2002 Short-Form Evaluation for Mental Disorders to note a diagnosis of adjustment disorder, rule out major depression, alcohol dependence, reportedly in remission, heroin dependence by history, personality disorder, not otherwise specified, and rule out antisocial personality traits.  (AR 514.)  Dr. Patel noted plaintiff's normal motor activity and speech, cooperative behavior, orientation to all spheres, normal memory, average intelligence, mildly depressed mood, appropriate affect, goal-directed thought process, and intact judgment.  (AR 514, 515.)  Dr. Patel assessed that plaintiff has good ability to understand, remember and carry out simple instructions and fair ability to understand, remember and carry out complex instructions, to maintain concentration, attention and persistence, to perform activities within a schedule, to maintain regular attendance, to complete a normal workday and workweek, and to respond appropriately to work setting changes.  (AR 515, 516.)

October and November 2002 notes reflect plaintiff's good medication compliance, depressed mood, ok sleep, cooperative behavior, dysphoric, anxious and depressed mood, unremarkable thought process and content, fair insight and judgment, intact memory and attention/concentration, and average intelligence.  (AR 504, 509.)

### *California Department Of Corrections*

In April 1997, plaintiff was incarcerated with the California Department of Corrections for grand theft.  (AR 372.)  Plaintiff's prior criminal history included perjury, petty theft and grand theft.  (AR 372.)  On April 10, 1997, plaintiff noted her "good" mental and physical health.  (AR 371.)

### *Department Of Rehabilitation*

According to a May 15, 1998 Department of Rehabilitation psychological evaluation, plaintiff scored on the Wechsler Adult Intelligence Scale ("WAIS") an 80 Verbal IQ, 80 Performance IQ and 79 Full Scale IQ.  (AR 318.)  Plaintiff was diagnosed with organic mental disorder with dementia.  (AR 319.)

### *Tomas B. Rios, M.D., Consultative Internist*

Internist Tomas B. Rios, M.D. ("Dr. Rios"), conducted an internal medicine evaluation of plaintiff and prepared a June 3, 1998 report.  (AR 322.)  Dr. Rios emphasized that plaintiff returned to

1   her CNA work after repeated beatings.  (AR 322, 324.)  Dr. Rios' examination revealed preserved

2   thoracic kyphosis and lumbar lordosis and extremities within normal range of motion.  (AR 323.)  Dr.

3   Rios diagnosed status post left forearm orthopedic plate replacement and histories of lumbar back

4   syndrome, assault and drug use.  (AR 323.)  Dr. Rios assessed that plaintiff would have difficulty with

5   her left (non-dominant) hand to push/pull, twist, and lift/carry.  (AR 324.)  Dr. Rios found that plaintiff's

6   "low back pain syndrome with periodic bout of sciatica is not fully corroborated" in the absence of nerve

7   root irritation or myospasms.  (AR 324.)  Dr. Rios found plaintiff capable occasionally to bend, squat,

8   climb and crawl and to carry up to 50 pounds and frequently to carry up to 10 pounds.  (AR 324.)

9   　　　Dr. Rios conducted a further comprehensive internal medicine evaluation and prepared a

10   September 2, 1998 report.  (AR 375.)  Dr. Rios' examination revealed preserved thoracic kyphosis and

11   lumbar lordosis with no accompanying myospasms along the paralumbar musculature.  (AR 376.)  Dr.

12   Rios noted plaintiff's normal range of motion in her extremities.  (AR 376.)  As to plaintiff's left (non-

13   dominant arm), Dr. Rios assessed "some functional limitation" as to repetitive pushing/pulling and

14   difficulty to lift/carry 30 pounds occasionally and 15 pounds frequently.  (AR 377.)  Dr. Rios found no

15   restriction of plaintiff's dominant right hand.  (AR 377.)  Dr. Rios observed that plaintiff's "complaints

16   of low back pain with periodic bouts of sciatic distribution were not substantiated." (AR 377.)  Dr. Rios

17   found an absence of nerve root irritation or myospasms.  (AR 377.)  Dr. Rios assessed "some difficulty

18   with activities that require plaintiff to perform repetitive bending, squatting, climbing or crawling." (AR

19   377.)  Dr. Rios noted the absence of a labor impairing neurological deficit regarding plaintiff's closed

20   head injury.  (AR 377.)  Dr. Rios again diagnosed status post left forearm orthopedic plate placement

21   and histories of lumbar back syndrome, assault and drug abuse.  (AR 376.)

22   　　　Dr. Rios conducted a May 20, 2002 comprehensive internal medicine examination, and

23   plaintiff's chief complaint was left arm injury.  (AR 459.)  Plaintiff claimed inability to perform

24   repetitive push/pull activities or forceful grasping due to pain.  (AR 459.)  Dr. Rios' examination

25   revealed plaintiff's full left shoulder range of motion and slightly diminished left grip strength.  (AR

26   461.)  Dr. Rios diagnosed status post repair of entrapment of left neuropathic ulnar nerve. (AR 461.)

27   Dr. Rios assessed residual range of motion limitation on the elbow region and residual complications

28   from entrapment neuropathy to the ulnar nerve.  (AR 461.)  Dr. Rios further assessed slight wasting of

1   the hypothenar pad with diminished grip strength.  (AR 461.)  Dr. Rios precluded plaintiff from left arm

2   forceful grasping and twisting and push/pull activities or repetitive above left shoulder work.  (AR 461.)

3   Dr. Rios noted no right dominant arm limitation.  (AR 461.)

### Manick Bhardwaj, M.D., Consultative Internist

5   Internist Manick Bhardwaj, M.D. ("Dr. Bhardwaj"), conducted a September 9, 1998 consultative

6   examination and noted that plaintiff had reported a stroke in 1988, recent prison release, and a history

7   of drug abuse, including heroin two years prior to the examination.  (AR 378.)  Dr. Bhardwaj's

8   examination revealed normal joint range of motion, 5/5 bilateral hand muscle grip strength, and neither

9   lower back tenderness nor joint swelling.  (AR 379.)  Dr. Bhardwaj assessed a history of depression,

10  occasional low back pain, and no residual defects from a cerebrovascular accident.  (AR 380.)

### Akira Suzuki, Ph.D., Consultative Psychologist

12  Psychologist Akira Suzuki, Ph.D. ("Dr. Suzuki"), conducted a September 23, 1998 consultative

13  evaluation of plaintiff.  (AR 382.)  Plaintiff noted to Dr. Suzuki that plaintiff was on probation for grand

14  theft and had been a heavy heroin user for 13 years although she had been clean for 2½ years prior to

15  the examination.  (AR 382, 383.)  Plaintiff acknowledged that she is able to perform simple household

16  chores and cooking.  (AR 383.)  Plaintiff explained that she had sustained head beatings.  (AR 384.)  Dr.

17  Suzuki's examination revealed no physical abnormality, fair attention/concentration and low-average

18  to borderline intellectual functioning.  (AR 384.)  Wechler Adult Intelligence Scale, Revised ("WAIS-

19  R") testing revealed a 72 full scale IQ, 75 verbal IQ, and 71 performance IQ.  (AR 385.)  Dr. Suzuki

20  found that based on plaintiff's "apprehension and withdrawal," the test results "are most likely a fair

21  estimate of her actual intellectual functioning."  (AR 385.)  Dr. Suzuki noted "somatic conditions with

22  lowered intelligence and memory functioning but no significant organicity."  (AR 387.)  Dr. Suzuki

23  assessed that plaintiff failed to meet the criteria for "major depressive episode" and diagnosed depressive

24  disorder not otherwise specified and rule out borderline intellectual functioning.  (AR 387.)  Dr. Suzuki

25  found heroin dependence as plaintiff's "primary problem."  (AR 387.)

### S.E. Medical

27  In fall 1998, plaintiff treated at S.E. Medical in Bakersfield.  (AR 391-393.)  Plaintiff complained

28  of arm, back and leg pain, sweats, chills, nausea, spasms, and sleeping trouble.  (AR 391, 393.)  The

treating physician surmised that plaintiff was "drug seeking" in that she asked for Valium.  (AR 392, 393.)  Notes indicate that plaintiff "confesses that symptoms are from being back on heroin." (AR 391.)

### *Howard Jackson, M.D., Treating Physician*

Beginning in July 2001, Howard Jackson, M.D. ("Dr. Jackson"), treated plaintiff for ailments, including anxiety, depression, chronic elbow pain, lumbosacral strain, abdomen pain, gastritis, and insomnia – all of which plaintiff was treated with a medication regimen.  (AR 609-614, 618, 623-630, 652-655.)  As of February 26, 2002, Dr. Jackson diagnosed left elbow arthritis, anxiety, insomnia and depression, and his prognosis was guarded.  (AR 615.)

Dr. Jackson completed a January 15, 2003 Physical Capacities form to conclude that plaintiff, during an eight-hour workday, is able to: (1) stand/walk up to two hours at a time and two to four hours in total; and (2) sit up to two hours.  (AR 607.)  Dr. Jackson found no restrictions in use of plaintiff's hands/fingers for repetitive motions.  (AR 607.)  Dr. Jackson noted that plaintiff is restricted to use her feet for repetitive movements due to her low back and disk herniation.  (AR 607.)  Dr. Jackson assessed that plaintiff is able occasionally to lift up to 10 pounds, balance, stoop, kneel, crouch, crawl and reach.  (AR 608.)

Dr. Jackson completed a July 7, 2003 Physical Capacities form to conclude that plaintiff, during an eight-hour workday, is able to: (1) stand/walk up to two hours at a time and two to four hours in total; and (2) sit up to two hours at a time and two to four hours in total.  (AR 603.)  Dr. Jackson found no restrictions in use of plaintiff's hands/fingers or feet for repetitive motions.  (AR 607.)  Dr. Jackson assessed that plaintiff is able occasionally to lift up to 10 pounds, balance, stoop, kneel, crouch, crawl and reach.  (AR 608.)

Dr. Jackson completed a July 31, 2003 Questionnaire to note that plaintiff's medical problems preclude her to perform full-time work at any exertional level.  (AR 602.)  Dr. Jackson noted plaintiff's primary impairment of lumbosacral discogenic disease with herniation.  (AR 602.)  Dr. Jackson assessed that during an eight-hour day, plaintiff is able to: (1) sit up to two hours at a time and four to six hours in total; (2) stand one to two hours; and (3) walk one to two hours.  (AR 602.)  Dr. Jackson noted that plaintiff needs to lie down or elevate her legs one hour during an eight-hour day.  (AR 602.)  Dr. Jackson restricted plaintiff from repetitive foot movement and assessed a July 2002 disability onset date.  (AR

602.)

Dr. Jackson completed an August 1, 2003 Physical Capacities Evaluation to conclude that during an eight-hour workday, plaintiff is able to: (1) sit two hours at a time and five hours in total; (2) stand an hour at a time and two hours in total; and (3) walk one hour at a time and in total. (AR 601.) Dr. Jackson further assessed that plaintiff is able occasionally to lift/carry up to 20 pounds, bend, crawl, climb and reach. (AR 601.) Dr. Jackson found no limitation to repetitive hand action but restricted repetitive leg movement. (AR 601.)

Dr. Jackson completed an April 14, 2004 Physical Capacities Evaluation to conclude that plaintiff is able to: (1) sit continuously for 30 minutes; (2) walk/stand continuously for 15-30 minutes; (3) sit four hours in an eight-hour workday; (4) stand/walk two hours in an eight-hour workday; and (5) lift/carry five to ten pounds. (AR 671.) Dr. Jackson checked "yes" to questions that to relieve pain, plaintiff needs to change positions often and to lie down periodically throughout day. (AR 671.) Dr. Jackson checked "no" to a question whether plaintiff is able to sit upright for prolonged time periods with her head in a forward flexed position. (AR 671.) Dr. Jackson checked that plaintiff's pain is "marked." (AR 671.)

### *Advanced Pain Medicine*

Plaintiff treated with Advanced Pain Medicine beginning fall 2002. Plaintiff underwent a November 7, 14 and 21, 2002 lumbar epidural injections. (AR 663, 665, 667.) On October 23, 2003, Arturo Palencia, M.D. ("Dr. Palencia"), assessed left sacro iliitis, lumbar radicular pain left, and left facet joint arthropathy – lumbar. (AR 662.) Dr. Palencia recommended daily physical therapy strengthening and range of motion exercises, discontinuing Vicodin, prescribing Neurontin 100 mg, Methadone 10 mg, Baclofen 10 mg, corticosteroid injections, medial branch block left L4-5, L5-S1, and lumbar epidural injection. (AR 669.)

On February 19, 2004, plaintiff noted she had experienced 60-80 percent pain relief and improved sleep and was assessed with left sacro iliitis. (AR 661.) On March 2, 2004, plaintiff underwent steroid medial branch nerve blocks. (AR 659.) On March 12, 2004, plaintiff noted that she experienced 40-60 percent pain relief and was assessed with left sacro iliitis and left lumbar facet syndrome. (AR 658.) On March 30, 2004, plaintiff again reported 60-80 percent pain relief and was

1   assessed with lumbar joint arthropathy.  (AR 657.)

2       Rajiv Parti, M.D. ("Dr. Parti"), completed an April 16, 2004 Physical Capacities Evaluation to

3   conclude that plaintiff is able to: (1) lift/carry five pounds; (2) sit continuously for one and one half

4   hours; (3) walk/stand continuously for one to two hours; (4) sit up to two hours during an eight-hour

5   workday; and (5) stand/walk for one to two hours in an eight-hour workday.  (AR 656.)  Dr. Parti

6   checked "yes" to questions that plaintiff, to relieve pain, needs to change positions often and lie down

7   periodically throughout the day. (AR 656.) Dr. Parti checked "no" to a question whether plaintiff is able

8   to sit upright for prolonged time periods with her head in a forward flexed position.  (AR 656.)  Dr. Parti

9   checked that plaintiff's pain is "marked."  (AR 656.)

10                     ***O.B. Leramo, M.D., Consultative Neurosurgeon***

11       Dr. Jackson referred plaintiff to neurosurgeon O.B. Leramo, M.D. ("Dr. Leramo"), who

12   conducted a June 23, 2003 neurosurgical consultation to address plaintiff's low back pain with radiation

13   down the lower extremities.  (AR 598.)  Dr. Leramo's examination revealed plaintiff's normal gait,

14   speech and motor function, tenderness to palpation in the lumbosacral region, and limited lumbar spine

15   movement. (AR 599.) Dr. Leramo assessed low back pain, small L5-S1 disc herniation, left L4, L5 and

16   S1 radiculopathy, and mild obesity.  (AR 599.)  Dr. Leramo recommended conservative treatment,

17   weight loss, and physical therapy and started plaintiff on Vicodin . (AR 599.) Dr. Leramo assessed that

18   plaintiff was temporarily disabled.  (AR 595-597.)

19       July 28, 2003 notes reflect plaintiff's complaints of worsened back pain and falling three times.

20   (AR 650.)  An October 18, 2003 electrodiagnostic study revealed absence of peripheral neuropathy on

21   plaintiff's left leg, left peroneal nerve entrapment, and radiculopathy.  (AR 647.)  February 24, 2004

22   notes reflect that plaintiff "is doing well" and attends pain management.  (AR 642.)

23                     ***Rolando C. Young, M.D., Consultative Neurologist***

24       Neurologist Rolando C. Young, M.D. ("Dr. Young"), conducted an August 4, 2004 neurological

25   examination of plaintiff.  (AR 675.)  Plaintiff's examination revealed limited left shoulder and arm

26   movement and inability to move left lower extremity due to pain.  (AR 675, 676.)  Dr. Young assessed

27   plaintiff's right upper and lower extremities as 4/5 and found that the "left side is difficult to examine

28   because of the pain, but she appears to be moving the left side."  (AR 676.)  Dr. Young assessed chronic

1    pain syndrome and history of herniated disc, possible lumbar spondylosis, history of car accident, and

2    spousal abuse to contribute to pain trauma.  (AR 676.)  Dr. Young concluded that plaintiff "has a lot of

3    symptoms which make her disabled and unable to move and function."  (AR 676.)

### *Pain Medicine & Surgery Center*

5    Based on her diagnosis of lumbar disc protrusion and lumbar foraminal stenosis, plaintiff

6    underwent a September 21, 2004 lumbar epidural steroid injection at the left L5-S1 foramen.  (AR 677.)

### *Non-Examining Physicians*

8    A California Disability Determination Services ("DDS") physician completed a November 24,

9    1998 Mental Residual Functional Capacity Assessment to note that generally plaintiff is not significantly

10   limited in understanding and memory, sustained concentration and persistence, social interaction and

11   adaptation.  (AR 101-102.)  The physician noted that plaintiff's memory, understanding, concentration,

12   interaction and adaptation are sufficient for simple repetitive tasks.  (AR 103.)  Another DDS physician,

13   Arthur Jing, M.D. ("Dr. Jing"), affirmed the findings.  (AR 101.)

14   The DDS physician completed a November 24, 1998 Psychiatric Review Technique to note

15   plaintiff's mood disturbance, accompanied by full or partial manic or depressive syndrome, slight

16   restriction or difficulties of daily living activities and to maintain social functioning, and often

17   deficiencies of concentration, persistence or pace.  (AR 95, 99.)  Dr. Jing affirmed the findings.  (AR

18   92.)

19   A DDS physician completed a July 3, 2002 Physical Residual Functional Capacity Assessment

20   to conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2)

21   stand/walk about six hours in an eight-hour workday; and (3) sit about six hours in an eight-hour

22   workday.  (AR 463.)  The DDS physician found neither postural nor manipulative limitations, except

23   a limitation in handling and left side forceful repetitive gripping.  (AR 465.)

24   A DDS physician completed a July 3, 2002 Mental Residual Functional Capacity Assessment

25   to conclude that plaintiff generally is not significantly limited in understanding and memory, sustained

26   concentration and persistence, social interaction and adaptation.  (AR 472-473.)  The DDS physician

27   completed a July 3, 2002 Psychiatric Review Technique to note symptoms of depressive syndrome,

28   absence of restriction of daily living activities, mild difficulties in maintaining social functioning, and

1   marked difficulties in maintaining concentration, persistence or pace.  (AR 479, 486.)

2       DDS physician Lavanya Bobba, M.D. ("Dr. Bobba"), completed a November 21, 2002 Physical

3   Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 30 pounds

4   occasionally and 15 pounds frequently; (2) stand/walk about six hours in an eight-hour day; and (3) sit

5   about six hours in an eight-hour day.  (AR 566.)  Dr. Bobba's only postural limitations were occasional

6   ladder-rope-scaffold climbing and crawling.  (AR 567.)  Dr. Bobba's only manipulative limitation was

7   handling and no left upper extremity constant twisting.  (AR 568.)

8       DDS psychiatrist Marina C. Vea, M.D. ("Dr. Vea"), completed a November 21, 2002 Mental

9   Residual Functional Capacity Assessment to conclude generally that plaintiff is not significantly limited

10  in understanding and memory, sustained concentration and persistence, social interaction, and

11  adaptation.  (AR 573, 574.)  Dr. Vea noted that plaintiff: (1) understands and remembers simple job

12  instructions; (2) retains the ability to sustain concentration, attention, persistence and pace for simple,

13  repetitive tasks; (3) relates, interacts and gets along; and (4) adapts to changes in the work setting; and

14  (4) is able to perform simple, repetitive tasks.  (AR 575.)

15      Dr. Vea completed a November 21, 2002 Psychiatric Review Technique to note the presence of

16  adjustment disorder and heroin and alcohol dependence in remission.  (AR 580, 585.)  Dr. Vea found

17  mild restriction of daily living activities, difficulties to maintain social functioning, and difficulties to

18  maintain concentration, persistence or pace.  (AR 587.)

19                                  ***Medical Imaging***

20      October 19, 2000 x-rays of plaintiff's left elbow revealed an old healed fracture with deformity

21  of the proximal left ulna.  (AR 429.)  August 22, 2002 lumbar spine x-rays revealed minimal chronic

22  findings and absence of acute pathology.  (AR 493.)  Thoracic spine x-rays of the same date indicated

23  a chronic T5 wedge fracture and no otherwise acute findings.  (AR 493.)  A February 21, 2002 CT scan

24  of plaintiff's head was normal.  (AR 497.)  An October 14, 2002 CT scan of plaintiff lumbar spine

25  revealed a mild left paracentral protrusion of the L3-L4 disc and L4-L5 disc and mild central protrusion

26  of L5-S1 disc.  (AR 490.)  October 29, 2002 magnetic resonance imaging ("MRI") of plaintiff's lumbar

27  spine revealed ventral and left disc protrusion at L5-S1 to result in mild canal stenosis and moderate left

28  foraminal stenosis.  (AR 489.)  July 22, 2003 medical imaging revealed plaintiff's normal lumbosacral

spine.  (AR 651.)  An August 12, 2003 MRI of plaintiff's lumbar spine revealed early changes of disc degeneration at L5-S1 with diffuse disc bulging and absence of protrusion of nucleus pulposus and significant spinal stenosis.  (AR 649.)  An April 13, 2004 MRI of plaintiff's lumbar spine revealed at L5-S1 a 3mm protrusion of the left posterior disk margin to cause slight impingement of the left ventral thecal sac and minimal impingement of the S1 nerve root.  (AR 641.)  An August 13, 2004 CT scan of plaintiff's lumbar spine revealed ventral and left-sided disk protrusion at L5-S1 to result in mild canal stenosis and mild-to-moderate left foraminal stenosis.  (AR 674.)

### *Physical Therapy*

August 2003 physical therapy revealed "good potential for achieving the goals of decreasing pain, increasing strength, and improving function of the lumbar spine."  (AR 640.)

### *Medications*

Plaintiff's medications have included Voltaren 75 mg, Ultram 50 mg, Valium 10 mg, Trazodone, Pepcid 40 mg, Restoril 30 mg, Clonidine .2 mg, Relafen 500 mg, Soma 350 mg, Bromocriptine 2.5 mg, Tylenol 500 mg, Wellbutrin 150 mg, Lomotil, Ambien 10 mg, Remeron 30 mg, Paxil 30 mg, Ultram, Prozac 10 mg, Neurontin 100 mg, Methadone 10 mg, Baclofen 10 mg, Tramadol 50 mg, Famotidine 20 mg, Diazepam 10 mg, Vicodin, Levaquin 500 mg, Robaxin 750 mg, Fluoxetine 20 mg, and Fiorice.  (AR 249, 264-267, 283, 287, 289, 290, 293, 298.)

### **Plaintiff's Activities And Testimony**

### *Reports And Questionnaires*

Plaintiff completed an August 12, 1998 Disability Report to claim disability since November 25, 1995 due to black outs, inability to stand "long" because of back and hip problems, and inability to concentrate, feel safe around people and tolerate loud places.  (AR 154.)  Plaintiff stopped working November 13, 1996.  (AR 154.)  Plaintiff's CNA work required her to care for people in a hospital and to perform lifting and bending.  (AR 157.)

Plaintiff completed an undated Disability Report – Adult to claim disability since August 13, 1995 due to bad back and a missing right hip bone.  (AR 165.)  Plaintiff is unable to stand "long" or to pick up heavy items.  (AR 165, 182.)

Plaintiff completed an August 29, 1998 Daily Activities Questionnaire to note that her household

chores include washing clothes and vacuuming. (AR 208.) Plaintiff takes no medication for her condition. (AR 211.) A plate in plaintiff's left arm prevents her to "hold anything." (AR 211.)

In an undated Functional Report – Adult, plaintiff claimed to have lower back sciatica, a missing right hip bone, and a plate to hold up her right arm. (AR 223.) In an undated Pain Report – Adult, plaintiff claimed to experience: (1) aching lower back pain twice a day and which lasted 10 minutes to prevent her to stand and for which she took Soma and Tylenol for relief; (2) left arm throbbing pain three or four times a day and which lasted 30 minutes to prevent her to lift and for which she took Tylenol for relief; and (3) aching hip pain four or five times a day and which lasted 10-15 minutes to prevent her to get up and walk and for which she took Tylenol for relief. (AR 225-230.)

Plaintiff completed a December 16, 1998 Reconsideration Report to note nervousness and fear when around people since her prison release. (AR 243.) Plaintiff further noted left arm, back, leg and concentration problems. (AR 243, 245.) Plaintiff completed a December 21, 1998 Reconsideration Disability Report to claim worsened conditions of depression, blackouts and arthritis. (AR 239.) In an undated statement, plaintiff noted that her anxiety, depression, arthritis and back problems had worsened and that she experienced "trouble" with daily living activities. (AR 247.)

Plaintiff completed a February 27, 2002 Disability Report Adult to claim that depression, insomnia, left elbow arthritis and anxiety limited her ability to work. (AR 251.) Plaintiff claimed that she became unable to work as of February 6, 1998 but noted that she worked thereafter and stopped working on February 10, 2000 after a left arm operation and due to depression and anxiety. (AR 251.)

Plaintiff completed an undated Daily Activities Questionnaire to note that she attends adult school Monday through Friday. (AR 268.) Plaintiff prepares her meals, grocery shops, and does laundry and dusting. (AR 269.) Plaintiff reads school books daily and drives to school. (AR 270, 271.) Plaintiff claimed inability to work due to depression, anxiety and left elbow arthritis. (AR 272.) Plaintiff attempted to work in a restaurant. (AR 272.)

In a July 18, 2002 Reconsideration Disability Report, plaintiff noted that she received mental health care treatment, including individual therapy and seeing a psychiatrist. (AR 274.) The report indicates that plaintiff was terminated from a job in February 2001. (AR 277.) Plaintiff completed a July 30, 2002 Reconsideration Disability Report to note her worsened condition of organic brain

1  dysfunction, elbow arthritis with surgery, anxiety, depression and dyslexia.  (AR 278.)  Plaintiff

2  completed a November 25, 2002 statement to note her worsened back, arms and mental condition.  (AR

3  282.)

4                          ***Plaintiff's June 16, 2004 ALJ Hearing Testimony***

5          Plaintiff testified at the June 16, 2004 ALJ hearing that she last worked on August 10, 2000 and

6  had worked in 1999 and 2000.  (AR 686, 687, 707.)  Plaintiff's hours varied, and at times she worked

7  up to 40 hours.  (AR 687.)  Plaintiff stopped working because she "got disabled" and experienced a 2001

8  automobile accident that "messed up" her back.  (AR 690.)  Plaintiff has three herniated discs and lost

9  left arm sensation.  (AR 690.)

10         Plaintiff goes to a pain management clinic biweekly for a nerve block epidural.  (AR 691.)

11  Plaintiff takes Methadone and Vicodin for pain and also takes Prozac, Neurontin, and Baclofen.  (AR

12  692.)  Prozac and Valium help plaintiff to sleep.  (AR 695.)

13         Plaintiff used drugs and alcohol five years prior to the ALJ hearing.  (AR 692.)  Plaintiff has two

14  theft convictions and has been incarcerated two or three times.  (AR 705, 707.)  Plaintiff was last

15  incarcerated in 1998 for grand theft of a watch which she took from a patient when she worked at a

16  rehabilitation center.  (AR 692, 706.)  Plaintiff served a 21-month sentence for the offense.  (AR 707.)

17         Plaintiff's first husband beat her, and plaintiff suffered broken legs and arm and required 17

18  stitches after he hit her head with a lamp.  (AR 693.)  Plaintiff has developed dyslexia and difficulty to

19  remember and to focus.  (AR 693.)  Plaintiff does not feel that she improves.  (AR 693.)

20         On a normal day, plaintiff lies does down.  (AR 693.)  Plaintiff rarely goes outside and tries to

21  attend church on Sundays.  (AR 693.)

22         Plaintiff has six children with two children (ages 10 and 11 at the time of the hearing) at home

23  with her.  (AR 693.)  Plaintiff's oldest daughter (age 21 at the time of the hearing) cares for the two

24  younger children.  (AR 693.)  Plaintiff neither performs housework nor cooks.  (AR 694.)

25         Plaintiff is unable to hold anything with her left arm but is able to hold a gallon of milk with her

26  right, dominant arm.  (AR 694, 703, 705.)  Plaintiff is able to walk two blocks and stand 30 minutes.

27  (AR 694, 695.)  Dr. Leramo prescribed plaintiff a cane three months prior to the hearing.  (AR 705.)

28  Plaintiff is unable to sit through an entire church service.  (AR 695.)

1  Plaintiff treats twice weekly at Kern County Mental Health for psychological problems.  (AR

2  696.)

3  *Plaintiff's November 2, 2004 ALJ Hearing Testimony*

4  Plaintiff testified at the November 2, 2004 supplemental ALJ hearing that after she was released

5  from prison, she started working in 1999 and stopped working August 10, 2000.  (AR 718, 722.)

6  Plaintiff worked on and off in 2000 and earned $6.45 an hour.  (AR 719.)  Plaintiff worked at Silver

7  Crest Manor/Noble Care where she "was watching people with Alzheimer and dementia" and who took

8  care of themselves.  (AR 721.)  Plaintiff just had "to watch them."  (AR 721.)  When asked how she was

9  able to work as a CNA until August 2000, plaintiff explained:

10  Because it was just watching people, that's all.  I wasn't doing any lifting.  And it was
    cooking – you know, just cooking light meals.  That's all I was doing.

11  . . .

12  . . . it was just to watch the older – the ones that couldn't take care of [themselves] that
13  had Alzheimer's and dementia.  (AR 725.)

14  Plaintiff has not worked since August 2000.  (AR 729.)

15  Plaintiff claims that her back has worsened and that she does not "have all the cushion that's in

16  my back.  It's gone."  (AR 714.)  Plaintiff has had six epidural injections and anticipates additional

17  injections twice a month.  (AR 726, 735.)  Methadone "barely" alleviates her pain.  (AR 727.)  Since a

18  spinal mylogram, plaintiff has experienced headaches for which she takes Butalb.  (AR 714, 715.)

19  Plaintiff takes Prozac for anxiety and depression.  (AR 727.)  Plaintiff experiences crying spells

20  and needs to lie down constantly.  (AR 728.)

21  Plaintiff admitted that she stole a watch and served a 21-month sentence for the crime.  (AR

22  721.)  When in prison, plaintiff fell from a truck and hurt her back.  (AR 723, 729.)

23  Plaintiff's attorney noted the onset of plaintiff's alleged disability is 2002.  (AR 733.)

24  **ALJ Findings**

25  With his January 11, 2005 decision, the ALJ identified the specific issue as whether plaintiff is

26  under a disability, defined as inability to engage in substantial gainful activity due to a medically

27  determinable physical or mental impairment expected to result in death or has lasted or can be expected

28  to last for a continuous period not less than 12 months.  (AR 16.)  In concluding that plaintiff has the

residual functional capacity to perform her past CNA work as she described and is thus neither disabled nor entitled to SSI, the ALJ found:

    1.    Plaintiff's status post fracture of the left forearm with open reduction and internal fixation, depression and mild degenerative disc disease of the lumbar spine with low back pain and possible arachnoiditis are severe but do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").

    2.    Plaintiff's allegations regarding her limitations are not totally credible.

    3.    Plaintiff has the residual functional capacity for simple, repetitive light work activity.

    4.    Plaintiff must avoid with the left upper extremity forceful, repetitive grasping or twisting and pushing/pulling or repetitive above shoulder work.

    5.    Plaintiff is able to stoop occasionally, lift 20 pounds occasionally and 10 pounds frequently, and sit, stand or walk six of eight hours.

    6.    Plaintiff's past relevant CNA work did not require performance of work-related activities precluded by her residual functional capacity.

    7.    Plaintiff's medically determinable impairments do not prevent plaintiff to perform her past relevant CNA work.  (AR 24-25.)

## DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant

/ / /

/ / /

/ / /

17

1  could perform light work contrary to treating physician's findings).[1] Substantial evidence is "more than

2  a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a

3  preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial

4  evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

5  *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

6       The record as a whole must be considered, weighing both the evidence that supports and detracts

7  from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995. If there is

8  substantial evidence to support the administrative finding, or if there is conflicting evidence that will

9  support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

10 *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). If the evidence is susceptible to more than

11 one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

12 *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

13 Cir. 1999).

14      This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

15 is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

16 whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988). "A decision of the ALJ will not be

17 reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

18      Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

19 and detailed objective medical reports of [her] condition from licensed medical professionals." *Meanel

20 v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

21 "Failure to prove disability justifies a denial of benefits." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th

22 Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116

23 S.Ct. 1356 (1996). Plaintiff must furnish medical and other evidence about plaintiff's medical

24 impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that

25 shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical

26 

27       [1]       "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th

28 Cir. 1997).

1  evidence to determine whether you are disabled or blind.  You are responsible for providing that

2  evidence.")

3  _____Plaintiff claims disability since 2002 chiefly due to mental impairment, left arm and back

4  impairments and arthritis.  (AR 23, 131, 149, 153, 733-734.)

5  **Past Relevant Work**

6  Plaintiff primarily challenges "the ALJ's determination that she can return to her past work with

7  functional limitations imposed" and argues that the ALJ improperly concluded that plaintiff "could

8  return to her past relevant work despite assessing a residual functional capacity incompatible with the

9  past work."  Plaintiff contends that her past CNA work is not simple and that the ALJ limited her to

10  simple work.  The Commissioner responds that "the ALJ reasonably determined that Plaintiff had the

11  RFC to perform her past relevant work, as she described it."

12  SSA regulations address past relevant work and note that SSA "will first compare our assessment

13  of your residual functional capacity with the physical and mental demands of your past relevant work."

14  20 C.F.R. § 404.1560(b).  SSA inquires of a claimant "for information about work you have done in the

15  past."  20 C.F.R. § 404.1560(b)(2); *see* 20 C.F.R. § 416.966(b) ("Under certain circumstances, we will

16  ask you about the work you have done in the past.").  Vocational expert testimony is unnecessary to

17  determine whether a claimant is able to perform past relevant work.  *See Crane v. Shalala*, 76 F.3d 251,

18  255 (9th Cir. 1996); 20 C.F.R. § 404.1560(b)(2).

19  The gist of plaintiff's position is that plaintiff's CNA work was not simple as described in the

20  Dictionary of Occupational Titles.  Such argument ignores plaintiff's own description of such work.

21  Plaintiff explained that she "was watching people with Alzheimer and dementia" and who took care of

22  themselves.  (AR 721.)  Plaintiff just had "to watch them."  (AR 721.)  When asked how she was able

23  to work as a CNA until August 2000, plaintiff explained:

24  Because it was just watching people, that's all.  I wasn't doing any lifting.  And it was cooking – you know, just cooking light meals.  That's all I was doing.

25  . . .

26  . . . it was just to watch the older – the ones that couldn't take care of [themselves] that had Alzheimer's and dementia.  (AR 725.)

27

28  The ALJ correctly noted plaintiff's abilities:

19

1

2

3

4

5

6

> Certainly, the claimant's ability to understand, remember and carry out one or two-step simple job instructions has not been eroded by her psychiatric impairment.  My conclusion in this respect is based upon the assessment of her own treating psychiatrist [Dr. Patel].  Generally, the claimant lives in a manner unremarkable for her age and circumstances.  Accordingly, this record does not convincingly show that she cannot function socially or occupationally, and there have been no espidode[s] of decompensation of extended duration, or a complete inability to function independently outside the area of her home.  To the extent the claimant alleged disabling physical and mental impairments that would preclude all activity, her testimony was unconvincing and unpersuasive.  (AR 24.)

7   Of significance, after plaintiff scored on WAIS-R a 72 full scale IQ, 75 Verbal IQ and 71

8   Performance IQ in September 1998, plaintiff successfully worked as an CNA.  (AR 385.)  Four months

9   earlier, plaintiff had scored on WAIS an 80 Verbal IQ, 80 Performance IQ and 79 Full Scale IQ.  (AR

10   318.)  Kern County Mental Health Services notes during 2002 consistently reflected plaintiff's fair

11   insight and judgment, unremarkable thought process, average intelligence, intact memory,

12   attention/concentration and orientation and good adult school performance.  (AR 504, 509, 519, 527,

13   531, 532, 540, 544.)  In August 2002, Dr. Patel noted plaintiff's normal memory, average intelligence,

14   goal-directed thought process, and intact judgment.  (AR 514, 515.)  Dr. Patel assessed that plaintiff has

15   good ability to understand, remember and carry out simple instructions and fair ability to understand,

16   remember and carry out complex instructions, to maintain concentration, attention and persistence, to

17   perform activities within a schedule, to maintain regular attendance, to complete a normal workday and

18   workweek, and to respond appropriately to work setting changes.  (AR 515, 516.)  DDS physicians

19   consistently found that plaintiff is not significantly limited in understanding and memory, sustained

20   concentration and persistence, social interaction and adaptation.  (AR 101-102, 472-473, 573, 574.)  A

21   DDS physician noted that plaintiff's memory, understanding, concentration, interaction and adaptation

22   are sufficient for simple repetitive tasks.  (AR 103.)  Dr. Vea found that plaintiff: (1) understands and

23   remembers simple job instructions; (2) retains the ability to sustain concentration, attention, persistence

24   and pace for simple, repetitive tasks; (3) relates, interacts and gets along; and (4) adapts to changes in

25   the work setting; and (5) is able to perform simple, repetitive tasks.  (AR 575.)

26   Plaintiff bears the burden to prove that she in unable to return to her former type of work.

27   *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993); *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir.

28   1986).  Plaintiff fails to meet such burden given the substantial evidence that plaintiff is able to return

1    to her CNA work as she described it.

2    **CONCLUSION AND ORDER**

3    For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

4    properly concluded that plaintiff is not disabled.   This Court further finds the ALJ's decision is

5    supported by substantial evidence in the record as a whole and based on proper legal standards.

6    Accordingly, this Court DENIES plaintiff's requests to reverse the Commissioner's decision, to award

7    plaintiff SSI or to remand for further proceedings. This Court DIRECTS the Court's clerk to enter

8    judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

9    plaintiff Angela Musaad and to close this action.

10   IT IS SO ORDERED.

11   **Dated:    January 31, 2007**              **/s/ Lawrence J. O'Neill**
     66h44d                                      UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21